IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 19, 2019

## STATE OF TENNESSEE v. AARON DALE DODSON

**Appeal from the Criminal Court for Davidson County**
**No. 2015-A-791      Steve Dozier, Judge**

_____

### No. M2018-01333-CCA-R3-CD

_____

The Defendant, Aaron Dale Dodson, was convicted by a jury of one count of first degree felony murder; one count of especially aggravated robbery, a Class A felony; and one count of aggravated kidnapping, a Class B felony. See Tenn. Code Ann. §§ 39-13-202, -304, -403. The trial court imposed an effective sentence of life imprisonment. On appeal, the Defendant contends that the evidence was insufficient to sustain his felony murder and especially aggravated robbery convictions. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ROBERT L. HOLLOWAY, JR., J., joined.

Jay Umerley (on appeal); and Nicholas McGregor (at trial), Nashville, Tennessee, for the appellant, Aaron Dale Dodson.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Chandler Harris and J. Wesley King, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### FACTUAL BACKGROUND

This case arises from the September 21, 2014 shooting death of the victim, Ricky A. Burgett, Jr., at his apartment. On March 27, 2015, the Davidson County Grand Jury indicted the Defendant and his co-defendant, Oral Patterson, for the first degree felony murder and especially aggravated robbery of the victim and the aggravated kidnapping of the victim's roommate, Thomas Moreno. The Defendant's case was severed for trial.

At trial, Mr. Moreno testified that the victim was his longtime friend and roommate and that at the time of the victim's death, they had been living in Nashville for about nine months. Mr. Moreno acknowledged that he had a 2015 felony conviction for forging a driver's license and a prior felony conviction for "some other type of [assault] offenses against police[.]" On September 21, 2014, Mr. Moreno and the victim planned to go to a cell phone store to buy new phones. Mr. Moreno arrived home from work first. When the victim arrived, he gave Mr. Moreno some food he picked up and then went into the bathroom. Five to ten minutes after the victim went into the bathroom, Mr. Moreno was sitting on his bed eating when the Defendant entered the front door of the apartment. The Defendant pointed a gun at Mr. Moreno, ordered Mr. Moreno to get on the floor, and asked him where "the money was." Mr. Moreno noted that the Defendant's voice "wasn't too loud." Mr. Moreno laid chest-down on the floor and noted that an African-American man, later identified as Oral Patterson, entered the apartment. The Defendant stood over Mr. Moreno and pointed the gun at him; Mr. Patterson searched the house. Mr. Moreno stated that he did not have any money to give the men and that both men were unknown to him.

Mr. Moreno testified that he heard the victim's cell phone ring inside the bathroom, that the Defendant handed the gun to Mr. Patterson, and that Mr. Patterson tried to open the bathroom door. Mr. Moreno could see the bathroom door from his vantage point on the floor. The Defendant continued to stand above Mr. Moreno; Mr. Patterson opened the bathroom door; and Mr. Moreno heard "some tussling" and a gunshot. Mr. Moreno did not see the shooting. A couple of seconds later, Mr. Patterson walked backwards out of the bathroom, and the victim, who had been shot once, came out and fell onto the floor. Mr. Patterson resumed searching the apartment, and Mr. Moreno noted that "they were going through everything." Mr. Moreno did not know if the men spoke to one another, and he did not see them take anything. Mr. Moreno agreed that the Defendant "did all of the talking" and denied that Mr. Patterson spoke to him or threatened him.

In order to get the men out of his apartment, Mr. Moreno told them that he had money "stashed" in another apartment. The Defendant told Mr. Moreno to take them to it. As Mr. Moreno led the men downstairs, the Defendant walked behind Mr. Moreno and told him, "[D]on't do nothing stupid[.]" Mr. Patterson had the gun and walked behind the Defendant. When asked whether Mr. Moreno felt free to leave, Mr. Moreno answered negatively.

In the apartment courtyard, Mr. Moreno encountered two friends, LaNise Scott and Kelsey Hill, whom he attempted to signal by putting up his hands and giving "a look." The Defendant told Mr. Moreno to put his hands down and not to "be stupid." Mr. Moreno saw the women stop "because they knew something wasn't right." Mr.

Moreno led the Defendant and Mr. Patterson to a vacant apartment and knocked on the door.

Mr. Moreno continued knocking at the door, and after an interval Mr. Patterson said, "[F]orget this[,] we got to get out of here right now." The Defendant and Mr. Patterson ran away. Mr. Moreno ran back to the apartment, passing Ms. Scott and Ms. Hill. Mr. Moreno told the women that the victim had been shot and to call the police and an ambulance. When Mr. Moreno reached the victim, Mr. Moreno "could hear him trying to breathe[,]" although the victim could not communicate. Mr. Moreno dragged the victim outside, and some neighbors helped Mr. Moreno carry him down the stairs. Although Ms. Scott and Ms. Hill called 9-1-1, they were put on hold, and the women ultimately drove the victim and Mr. Moreno to the hospital. Mr. Moreno spoke with the police in the hospital waiting room. Mr. Moreno did not know why the Defendant and Mr. Patterson came into the apartment; to his knowledge, the victim did not know the men either. Mr. Moreno acknowledged that the police found "an amount of marijuana" in the apartment, although they did not find any scales or "small sandwich bags." He noted that he did not own a weapon. Mr. Moreno denied being a drug dealer. Mr. Moreno identified the Defendant and Mr. Patterson in photographic lineups on September 26, 2014.

On cross-examination, Mr. Moreno agreed that the Defendant did not point the gun at or threaten the victim, take anything from the victim, or shoot the victim. Mr. Moreno further agreed that Mr. Patterson shot the victim. When asked whether the Defendant directed Mr. Patterson to shoot the victim, Mr. Moreno responded, "I don't know what they were talking about." Mr. Moreno did not recall the Defendant's yelling at Mr. Patterson to shoot the victim. Mr. Moreno agreed that Mr. Patterson shot an unarmed man. Mr. Moreno also agreed that Mr. Patterson kicked the bathroom door, which was locked, until it opened, and that Mr. Patterson was holding the gun during this process. Mr. Moreno denied that Mr. Patterson appeared "shocked or surprised" after shooting the victim. After Mr. Patterson shot the victim, Mr. Patterson did not "indicate they needed to leave right away[.]" When Mr. Moreno stood up after the shooting, Mr. Patterson did not point the gun at him. Mr. Patterson attempted to conceal the gun as the three men left the apartment. Mr. Moreno knew Mr. Patterson still had the gun, and Mr. Moreno expected the gun to be loaded after the victim was shot. Mr. Moreno stated that when he was on the apartment floor, he looked toward the door and not at the ground. Mr. Moreno stated that the Defendant did not take anything from him or injure him. The Defendant did not have a weapon when they were outside the apartment after the shooting.

On redirect examination, Mr. Moreno testified that when the Defendant and Mr. Patterson entered his apartment, they did not search the other rooms and seemed to think

Mr. Moreno was home alone until the victim's cell phone rang from the bathroom. The Defendant gave Mr. Patterson the gun and told him to "go check it out[.]" When asked who was "running the show," Mr. Moreno responded, "I would say [the Defendant]."

Ms. Scott testified that on September 21, 2014, she lived in an apartment two floors below Mr. Moreno and the victim. She had known Mr. Moreno for seven or eight months and considered the victim, whom she had known for four months, to be her best friend. On September 21, 2014, around two or three o'clock in the afternoon, Ms. Scott was walking into the apartment complex's courtyard with her roommate, Ms. Hill, when she saw Mr. Moreno walking down the stairs from the third floor with a Caucasian man and an African-American man following behind him. Mr. Moreno was "acting completely different," and Ms. Scott had never seen the two men accompanying Mr. Moreno before. Neither man wore a mask or disguise. Mr. Moreno put his hands up in greeting, but one of the men told Mr. Moreno to put his hands down. Ms. Scott did not remember which man spoke. Mr. Moreno walked to an apartment and began "ferociously" knocking on the door. Ms. Scott noted that the apartment at which Mr. Moreno knocked was empty. Ms. Scott stared at the three men because she "felt like something was wrong, it wasn't normal[,]" and the two unknown men "took off running." Ms. Scott estimated that the entire encounter lasted three to five minutes. Although Ms. Scott did not see a weapon, she noted that the African-American man kept his hands "in his shorts" the entire time.

After the men fled, Mr. Moreno turned around, told Ms. Scott that "they" shot the victim, and Mr. Moreno, Ms. Scott, and Ms. Hill ran upstairs. When they entered the apartment, the victim, who was "super pale" and "foaming at the mouth," was on the floor inside the doorway. Ms. Scott called 9-1-1 and was placed on hold. Ms. Hill retrieved Ms. Scott's car, and Ms. Scott and Mr. Moreno carried the victim downstairs before driving him to a nearby hospital. Ms. Scott identified the Defendant and Mr. Patterson in photographic lineups on September 23, 2014, and October 8, 2014, respectively. Ms. Scott agreed that she identified the Defendant in court at the preliminary hearing, and she identified the Defendant in the courtroom. On cross-examination, Ms. Scott stated that she did not witness the shooting and that she was not robbed or threatened.

Kelsey Hill testified that on September 21, 2014, she was living with Ms. Scott and that she worked with Ms. Scott and Mr. Moreno. Ms. Hill had known both the victim and Mr. Moreno for about one month. Ms. Hill was walking through the courtyard with Ms. Scott when she saw Mr. Moreno walking down the steps with a Caucasian man and an African-American man. Mr. Moreno looked "worried" and "distressed" and did not speak to Ms. Hill and Ms. Scott as he would normally. Mr. Moreno walked to an apartment door and knocked on it; the two men "ended up taking off running"; and Mr.

-4-

Moreno "announced" that the victim had been shot. Ms. Hill and Ms. Scott followed Mr. Moreno upstairs to his apartment, where the victim, who was pale and foaming at the mouth, was lying on the floor. After unsuccessfully attempting to call 9-1-1, Ms. Hill retrieved her car, and the group took the victim to the hospital. Ms. Hill was not able to later identify the African-American man, but she identified the Defendant to the police and in court.[1] Ms. Hill did not see either man with a weapon.

Metro Nashville Police Sergeant Kevin Taylor testified that in 2014, he was a detective and investigated the victim's murder. Sergeant Taylor noted that the victim's injury did not produce any quantity of external bleeding and that at the hospital, the doctors did not immediately realize he had been shot.

Sergeant Taylor obtained a surveillance recording from a women's clinic across the street from the victim's apartment complex, which reflected that on September 21, 2014, at 2:24 p.m., a Caucasian man dressed in shorts and a dark-colored shirt and an African-American man dressed in long pants and a dark shirt walked past the camera toward an apartment building. At 2:30 p.m., the same two men ran past the camera in the other direction. A separate camera angle showed a white Pontiac G6 sedan in the parking lot of the women's clinic. Sergeant Taylor stated that his investigation determined this was the car in which the Defendant and Mr. Patterson arrived and fled the scene. The surveillance recording was aired on local television in order to locate the suspects.

On September 23, 2014, the police received a telephone call from the Defendant's mother, who gave them a gun she had in her house. A bullet recovered from the victim's body was tested by the Tennessee Bureau of Investigation (TBI), and it was confirmed that the bullet was fired from the same gun.

As a result of the conversation with the Defendant's mother, Sergeant Taylor placed the Defendant's photograph in a lineup. Mr. Moreno and Ms. Scott identified the Defendant in the lineup. Sergeant Taylor made a handwritten note on Mr. Moreno's lineup noting that the identification was immediate and that Mr. Moreno said the Defendant had "the gun" and demanded "weed and money[.]" A woman later called the police and identified Mr. Patterson as a suspect. Mr. Patterson was arrested and made a statement to Sergeant Taylor. Sergeant Taylor spoke to Mr. Moreno on many occasions, and his recollection of events was "always the same."

Sergeant Taylor requested data from the Defendant's cell phone carrier, which reflected a call placed on September 21, 2014, around 2:15 p.m. The cell phone

---

[1] Ms. Hill noted that she was not "100 percent" sure in her identification of the Defendant during the police lineup and that as a result, she did not mark the lineup. She stated, though, that the Defendant was "the only person [she saw]."

"communicated" with a cell tower located at the address of the victim's apartment complex. An arrest warrant was issued for the Defendant on September 29, 2014, and the Defendant was arrested on December 27, 2014.

On cross-examination, Sergeant Taylor testified that when he interviewed Mr. Patterson, Mr. Patterson tried to minimize his role in the shooting and was not forthright about his involvement. Sergeant Taylor told Mr. Patterson that "in this particular case it's going to be the f---ing death penalty" in an effort to communicate the "high degree of criminal nature" and the "kind of charge he [was] facing." Sergeant Taylor noted that Mr. Patterson was "very passive" during the interview and that after this comment, Mr. Patterson was more forthcoming. Sergeant Taylor denied having discussed plea offers with Mr. Patterson; he stated that he talked "about the sentencing as far as different variations of crimes[.]" At the beginning of the interview, Mr. Patterson denied knowing the Defendant, and by the end of the interview, Mr. Patterson said that the Defendant "called him to set [the robbery] up[.]" Sergeant Taylor stated that he believed the Defendant called Mr. Patterson. On redirect examination, Sergeant Taylor testified that it was common for a person to lie to the police during homicide investigations and that if subsequent information a person gave corroborated other evidence, he believed the person was telling the truth.

Metro Nashville Police Detective Anthony Chandler testified that on September 21, 2014, he responded to the hospital and spoke to Mr. Moreno, Ms. Scott, and Ms. Hill. Detective Chandler also searched the victim's apartment and recovered a bag containing three ounces of marijuana,[2] a marijuana pipe, a set of scales, a grinder used to prepare marijuana for smoking, and plastic sandwich bags. Detective Chandler did not believe that fingerprints from either the Defendant or Mr. Patterson were found at the crime scene, which was common in his experience. He stated that no weapons or blood were found in the apartment.

Mr. Patterson testified that the State had not promised him anything in exchange for his testimony and that he was facing trial the following month. Mr. Patterson identified an immunity agreement with the State, under which any statements he made in the Defendant's trial would not be used against Mr. Patterson in his trial unless a material difference arose in his testimony. Mr. Patterson acknowledged that he had not been truthful in his initial police interview. He stated that he felt "fully responsible for what [he] did" and as a result, "as far as everybody else that was involved, [he] left them out" in his initial statement. Mr. Patterson stated that he was the shooter and that he understood the consequences of having been the shooter. He further stated that he was not afraid of the Defendant.

---

[2] In the search warrant return supplement, which was completed several days after the search, Detective Chandler described the bag as a "large bag of marijuana."

Mr. Patterson testified that on September 21, 2014, he was at home watching a football game when he received a telephone call from a man named Chris Daughtry, who told Mr. Patterson that he needed help with a robbery. Mr. Patterson initially declined to help Mr. Daughtry, but Mr. Daughtry called him back a short time later saying "that it would be easy . . . . [He r]eally just needed [Mr. Patterson] to kick the door in and go in and strong arm two people for some drugs, weed, marijuana[.]" Mr. Patterson understood "a strong arm" to mean that they would take the marijuana and "probably beat them up at the most." Mr. Patterson agreed because he wanted to help his friend. Mr. Patterson noted that Mr. Daughtry wanted Mr. Patterson's help because Mr. Patterson was "big[.]" Mr. Patterson did not know anything about the victims other than that they owed "some other guy two pounds of marijuana." According to Mr. Patterson, the Defendant was not involved in the telephone calls.

The first time Mr. Patterson saw the Defendant, whom Mr. Patterson had met on a previous occasion, was when Mr. Daughtry picked up Mr. Patterson. Another man whose name Mr. Patterson did not know was also in the car. The Defendant had a revolver in his lap, and Mr. Patterson and the other men did not have weapons. Mr. Patterson did not know where they were going. Other than discussing whether there were surveillance cameras at the apartment complex, they did not talk about the robbery and instead listened to music.

Mr. Patterson identified the white Pontiac sedan, himself, and the Defendant in still photographs taken from the women's clinic surveillance recording. He agreed that the time stamp reflected both the time they arrived at the apartment complex and left. Mr. Patterson testified that when he and the Defendant walked to the apartment, he did not know to which apartment they were going and the Defendant led the way. The Defendant did not speak to Mr. Patterson. The Defendant had the revolver in his pocket. When they arrived at the victim's apartment, Mr. Patterson looked through the peephole and opened the door, which was unlocked. Mr. Patterson entered the apartment, followed by the Defendant, and he saw Mr. Moreno sitting on what he assumed was a bed and watching television.

The Defendant told Mr. Moreno to get on the ground and he complied. The Defendant had the revolver in his hand and guarded Mr. Moreno while Mr. Patterson searched the apartment for marijuana. Mr. Patterson opened a door and saw "somebody in there using the restroom"; Mr. Patterson was startled and closed the door; and Mr. Patterson told the Defendant someone else was in the apartment. The victim locked the door, and the Defendant came over and kicked the door to try to open it. The Defendant handed the revolver to Mr. Patterson before he kicked the door. The door hinge broke, and Mr. Patterson "bum rushed [his] way in."

When Mr. Patterson entered the bathroom, the victim was on the floor, and Mr. Patterson told him to go into the living room area. The victim was on his knees and had a cell phone in his hand. Mr. Patterson saw that the victim was trying to dial 9-1-1, and the victim moved slowly, "like if he was contemplating his next move." Mr. Patterson "had the gun back toward [his] chest area because [he] thought [the victim] was going to try something." The victim turned as though he was going to run to the apartment door, and Mr. Patterson shot him. The victim grabbed his left shoulder and fell on the floor, but Mr. Patterson did not see any blood. Mr. Patterson took the cell phone, hung up the call, and placed the phone in his own pocket. Mr. Patterson came into the living area and told the Defendant that the victim had been shot. Mr. Patterson denied continuing to search the apartment and stated that he and the Defendant were in shock. Mr. Moreno told Mr. Patterson and the Defendant that "the drugs and the money" were in another apartment, and the three men left the apartment. Mr. Moreno was not free to leave. Mr. Patterson walked behind Mr. Moreno, and the Defendant walked behind Mr. Patterson. Mr. Patterson recalled seeing "a bunch of people" outside in the apartment complex. Mr. Moreno put his hands up when he saw the people, and the Defendant told Mr. Moreno to put his hands down. After no one answered the door at the downstairs apartment, Mr. Patterson and the Defendant looked at one another and Mr. Patterson said, "[W]e need to go." After knocking once more, Mr. Patterson and the Defendant fled to the car. The entire incident lasted about seven minutes.

Mr. Patterson testified that when they got back into the car, the Defendant asked why Mr. Patterson shot the victim and "showed his discomfort as far as [Mr. Patterson] making that mistake[.]" Otherwise, the men did not speak, and Mr. Patterson had not seen the Defendant since. Mr. Patterson threw the victim's cell phone off of a bridge. Mr. Patterson was under the impression that the victim and Mr. Moreno were drug dealers. He acknowledged, though, that he did not see anything in the apartment to indicate the men were selling drugs. Mr. Patterson noted that he was only in the apartment for a short time.

On cross-examination, Mr. Patterson opined that because the Defendant did not shoot the victim, the Defendant did not deserve to be convicted of first-degree murder. Mr. Patterson stated that he was testifying because he wanted the victim's family to know that he was "truly sorry for what [he] did" and wanted to "take full responsibility for it." He noted that he hoped it would provide the family closure and be a step toward their forgiving him. Mr. Patterson stated that he did not want the Defendant to be convicted for Mr. Patterson's actions.

Mr. Patterson testified that the Defendant never saw him with the victim's cell phone. Mr. Patterson acknowledged that he faced the same charges as the Defendant and faced a long prison sentence. Mr. Patterson denied hoping to obtain a "lighter

punishment" than the Defendant as a result of testifying. He agreed that he was "willing to accept the entire conviction." Mr. Patterson admitted having lied to investigators during his first police interview, including claiming not to know the Defendant, not knowing who shot the victim, and that the Defendant called him to set up the robbery. Mr. Patterson explained that it became apparent that the police "knew about me and [the Defendant]" and that he was attempting to protect Mr. Daughtry. Mr. Patterson acknowledged omitting from his police interview that he destroyed the victim's cell phone. Mr. Patterson destroyed it because he was "scared."

Mr. Patterson stated that after being incarcerated for one and one-half years, he "decided to think about someone other than [himself.]" Mr. Patterson acknowledged telling the police that he did not like the Defendant. He stated that he was intimidated by the police and that they told him he would get the death penalty. Mr. Patterson agreed that "[a]fter [he] heard that, [he] started changing [his] story to what they wanted to hear[.]" Mr. Patterson acknowledged that he held a gun to the victim's back, killed and stole from an unarmed man, and lied to cover up the killing. On redirect examination, Mr. Patterson stated that when he changed his story in the first police interview, he told the truth and that he initially lied to protect the individuals the police "didn't know about." He knew that he was not facing the death penalty and averred that at trial, he was telling the truth.

Dr. Erin Carney, an expert in forensic pathology, testified that a colleague at the medical examiner's office performed the victim's autopsy and that the autopsy report indicated the cause of death was a gunshot wound to the back and the manner of death was homicide. There was no gunpowder stippling around the entry wound, which made the range from which the shot was fired "indeterminate." The bullet entered the back left shoulder; fractured a rib; and perforated both lungs, the pericardial sac, and pulmonary artery. The bullet was recovered from the right side of the chest. The pathologist found a quantity of blood equal to three-fourths of the victim's total blood volume in the chest cavity and around the heart. Dr. Carney noted that due to the amount of blood in the chest cavity, she would not expect there to have been much external bleeding. The injuries to the lungs and pulmonary artery were fatal. Dr. Carney noted that even with quick medical attention, injuries to the pulmonary artery were hard to control and that the chance of survival was "low."

TBI Agent Jessica Hudson, an expert in firearms and tool mark analysis, testified that she analyzed the revolver from the Defendant's mother and the bullet retrieved from the victim's body and determined that the bullet was fired by that revolver.

Metro Nashville Police Officer Jason King testified that on December 27, 2014, he pulled over a vehicle driven by the Defendant's sister and that upon questioning, the Defendant gave two false names; eventually, the Defendant's sister admitted that an

arrest warrant had been issued for the Defendant. On the way to the police station, the Defendant said "he was going to be taking one for the team" and that Officer King "might as well shoot him in the head because he's about to do [fifteen] to [twenty years] for a murder." On cross-examination, Officer King agreed that the Defendant was not carrying a weapon and that he was compliant. Officer King did not know which individuals comprised the "team" to which the Defendant referred.

Terry Faimon testified that he was employed by the district attorney's office and that he listened to recordings of jail telephone calls placed by the Defendant. The Defendant placed calls to his father, mother, and sister. Mr. Faimon was aware that the prosecutor was "trying very hard" to contact the Defendant's mother and sister. Mr. Faimon identified four recorded calls, which were played for the jury.

A December 28, 2014 recording reflected a conversation between the Defendant and his mother. The Defendant's mother told him not to hang up the telephone or speak disrespectfully to her, otherwise she would tell the police "everything" the Defendant told her. The Defendant responds that she already gave the police "the g--d--- gun," and there was discussion about whether the Defendant's mother voluntarily provided the gun to the police. The Defendant stated that he did not "give a f---" if he went to prison for life.

A December 29, 2014 recording reflected a conversation with a woman named Malika. The Defendant stated that his mother had threatened to tell the police everything she knew and that if this occurred, he would get "another forty f---ing years." The Defendant said that he "cussed" her and hung up on her.

A January 5, 2015 recording reflected a conversation with the Defendant's father. The Defendant stated, "[T]he only thing I [can] think of . . . is like God put me in here for a reason, to teach me a lesson, to make me stop the s--- I was doing out there." A September 22, 2017 recording reflected a conversation with the Defendant's sister.[3]

The only defense proof was a stipulation regarding the lack of fingerprint evidence found at the crime scene. Upon this evidence, the jury convicted the Defendant as charged. The trial court imposed a mandatory life sentence for the felony murder conviction. After a sentencing hearing, the trial court ordered the Defendant to serve seventeen years for the especially aggravated robbery conviction and ten years for the aggravated kidnapping conviction, both to be served concurrently with the life sentence. The Defendant timely appealed.

---

[3] The disc included in the appellate record does not function. However, a pretrial hearing relative to this recording reflects that the Defendant told his sister not to speak to anyone about the case or post on social media until he told her otherwise.

## ANALYSIS

## I. Sufficiency of the Evidence

The sole issue on appeal is whether the evidence was sufficient to sustain the Defendant's convictions for felony murder and especially aggravated robbery.[4] The Defendant argues that "[o]nce [Mr.] Patterson deviated from the plan [to steal marijuana, the Defendant] was no longer criminally responsible for [Mr. Patterson's] actions." The State responds that the evidence was sufficient.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence, rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The foregoing standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Both "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the

---

[4] The Defendant does not challenge the sufficiency of the evidence relative to the aggravated kidnapping of Mr. Moreno.

[d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

As pertinent to our review, first degree felony murder is the "killing of another committed in the perpetration or attempt to perpetrate . . . [a] robbery[.]" Tenn. Code Ann. § 39-13-202(a)(2). "No culpable mental state is required for conviction" of first degree felony murder, "except the intent to commit the enumerated" offense. Tenn. Code Ann. § 39-13-202(b). Robbery "is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a).

### A. Felony Murder

Relative to felony murder, the Defendant argues that "the underlying felony [was] the robbery of [the victim's] cell phone." Although the original plan was to "steal drugs[,] . . . no evidence shows that they wanted cell phones." The Defendant further argues that because he "had no knowledge of the cell phone theft, no intent to steal the phone, and he didn't exercise control over the stolen phone" and "did not intend to promote, assist, aid, direct, or benefit" from the robbery of the victim's cell phone, the evidence was insufficient to support his conviction for felony murder. The State responds that the evidence at trial established the necessary criminal intent to find the Defendant criminally responsible for Mr. Patterson's actions.

"The felony murder rule applies when the killing is 'done in pursuance of the unlawful act, and not collateral to it.'" State v. Thacker, 164 S.W.3d 208, 223 (Tenn. 2005) (quoting Farmer v. State, 296 S.W.2d 879, 883 (Tenn. 1956)). Nonetheless, "[t]he killing may precede, coincide with, or follow the felony and still be considered as occurring 'in the perpetration of' the felony offense, so long as there is a connection in time, place, and continuity of action." Id. (internal quotation marks omitted) (quoting State v. Buggs, 995 S.W.2d 102, 106 (Tenn. 1999)). The jury "may reasonably infer from a defendant's actions immediately after a killing that the defendant had the intent to commit the felony prior to, or concurrent with, the killing." Id. (internal quotation marks omitted) (quoting Buggs, 995 S.W.2d at 106).

The jury was instructed in this case that the Defendant's guilt could be predicated upon a theory of criminal responsibility for the conduct of another. "A person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a). A person is criminally responsible for an offense committed by the conduct of another, if "[a]cting with intent to promote or assist

-12-

the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Tenn. Code Ann. § 39-11-402(2).

Although not a separate crime, criminal responsibility is a theory by which the State may alternatively establish guilt based on the conduct of another. Dorantes, 331 S.W.3d at 386 (citing State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999)). No specific act or deed needs to be demonstrated by the State, and the presence and companionship of an accused with the offender before and after the offense are circumstances from which participation in the crime may be inferred. State v. Ball, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). To be convicted, however, "the evidence must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission." Dorantes, 331 S.W.3d at 386 (citing State v. Maxey, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994)); see State v. Foster, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988)).

The Defendant's argument regarding the fact that a cell phone was stolen when the plan was to steal marijuana is wholly without merit and overlooks the plain text of the felony murder statute. Felony murder applies equally to a homicide occurring during the commission of an enumerated felony as to the attempted commission of the felony. Tenn. Code Ann. § 39-13-202(b). The Defendant does not argue that he did not intend to rob the victims of marijuana.

In the light most favorable to the State, the record reflects that the Defendant and Mr. Patterson were asked by a third party to steal marijuana from the victims. The Defendant brought a gun and, as both Mr. Patterson and Mr. Moreno testified, he was the leader of the two men. The Defendant willingly participated in this criminal endeavor. As is always a risk when committing a violent crime, the robbery did not go as planned, and Mr. Patterson fatally shot the victim using the Defendant's gun. The Defendant's and Mr. Patterson's lack of success in stealing marijuana is ultimately irrelevant to the determination of the Defendant's guilt relative to felony murder. The evidence was more than sufficient to find that the Defendant intended to promote or assist in the commission of a robbery and that, as a result, he was criminally responsible for the victim's death.

Likewise, the fact that Mr. Patterson committed a separate robbery of the victim's cell phone is irrelevant to the fact that the Defendant was fully aware that they were going to the victim's apartment to rob him and Mr. Moreno of marijuana. We note that the indictment in Count 1 charged the Defendant with felony murder perpetrated during the "perpetration or attempt to perpetrate robbery" and did not specify the object of the robbery. The Defendant is not entitled to relief on this basis.

*B. Especially Aggravated Robbery[5]*

As stated above, robbery "is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). Especially aggravated robbery is robbery accomplished with a deadly weapon when the victim suffers serious bodily injury. Tenn. Code Ann. § 39-13-403(a).

In the light most favorable to the State, the evidence at trial established that the Defendant and Mr. Patterson entered the victim's apartment in order to rob him and Mr. Moreno; the Defendant held Mr. Moreno at gunpoint while Mr. Patterson searched the apartment; after hearing a cell phone ring, Mr. Patterson broke down the bathroom door at the Defendant's instruction; Mr. Patterson pointed the gun at the victim before shooting him, which led to the victim's death; and Mr. Patterson took the victim's cell phone. Regardless of the target of the robbery, the Defendant was engaged in a criminal endeavor to rob the victim and Mr. Moreno, and he was criminally responsible for Mr. Patterson's actions, as we have discussed above. The Defendant is not entitled to relief on this basis.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
D. KELLY THOMAS, JR., JUDGE

---

[5] We note that the State's brief examines the sufficiency of the evidence for aggravated robbery. The Defendant was convicted of especially aggravated robbery.